2003-NMSC-009

66 P.3d 948

**Ubaldo LOZOYA, Sara Lozoya, and Osbaldo Lozoya, Plaintiffs–Appellants,**

v.

**Diego SANCHEZ, Statkus Engines, Ohio Casualty Group, Phillip McWaters d/b/a PDM Trucking, and Scottsdale Insurance Company, Defendants–Appellees.**

No. 27,755.

Supreme Court of New Mexico.

March 24, 2003.

Narciso Garcia, Jr., Albuquerque, NM, for Appellants.

Madison, Harbour, Mroz & Brennan, P.A., Neils L. Thompson, Gregory D. Steinman, Beall & Biehler, Gregory L. Biehler, Eugene I. Zamora, Albuquerque, NM, for Appellees.

**OPINION**

MINZNER, Justice.

{1} In this negligence action, Plaintiffs appealed to the Court of Appeals from a judgment and verdict of the district court. The Court of Appeals certified the matter to this Court, because the case involves an issue of substantial public interest as to whether unmarried cohabitants may recover against negligent actors for loss of consortium, and we accepted the certification. *See* NMSA 1978, § 34-5-14(C) (1972); Rule 12-606 NMRA 2003. Plaintiffs also raise several

additional points of error on appeal. We affirm as to all issues except the directed verdict as to the loss of consortium claim, and the verdict of no negligence as to one of the Defendants. We hold as a matter of first impression under New Mexico law that a claim for loss of consortium is not limited to married partners. We therefore affirm in part, reverse in part, and remand for further proceedings.

## I

{2} This case arises from two automobile collisions in which Ubaldo and Osbaldo Lozoya, father and son, were traveling together. The first of these collisions took place on June 21, 1999. Ubaldo and Osbaldo were stopped at a red light on Coors Boulevard in Albuquerque when another vehicle collided with them from behind. The other vehicle was driven by Defendant Diego Sanchez, an employee of Defendant Statkus Engines, LLC. Mr. Sanchez testified that he was traveling about 35 mph at the time that he applied his brakes, and an expert testified that he had slowed to between five and fifteen mph at the point of impact. The police officer who investigated the accident testified that the Lozoya vehicle received moderate damage, while the Statkus vehicle was more severely damaged.

{3} At the scene of the accident, neither of the Lozoyas complained of any injuries. Ubaldo began to experience pain shortly thereafter, however, in one of his arms, head, and legs. Father and son visited Presbyterian Occupational Medical Clinic eight days later. The doctor found that Ubaldo was experiencing tenderness in his neck and back, but that his range of motion in these areas was "pretty close to normal." An x-ray showed what appeared to be a compression of one of Ubaldo's vertebrae that "looked like it was old," but the doctor believed that the soreness Ubaldo was experiencing was a result of the accident. Ubaldo visited the same doctor again about a week later, and the doctor decided that Ubaldo could return to work on a light duty basis.

{4} Osbaldo reported experiencing lower back pain. The doctor referred him to a physiatrist (muscle & bone specialist) to determine if anything further should be done. The physiatrist diagnosed him as having a soft tissue injury and sent him to physical therapy. Osbaldo did not show up for this third appointment with the physiatrist so he was released from care.

{5} Ubaldo continued to experience pain, however, and he followed up with another doctor. This doctor ordered chiropractic care and physical therapy. Ubaldo went to one physical therapy appointment, then stopped. This doctor believed that Ubaldo would not be able to return to his former occupation because of the back problems he was experiencing. Ubaldo was presented with the options of either enduring the pain as it existed, taking medication, having "epidural blocks" performed, or surgery. Ubaldo decided that he did not want the injections or surgery.

{6} On April 18, 2000, approximately ten months after the first accident, Ubaldo and Osbaldo were involved in another collision as they were driving toward a job site. They were driving on Interstate 40, near the "Big-I" interchange when they were again rear-ended by another vehicle. This time, the other vehicle involved was a dump truck operated by Defendant Philip McWaters. The collision took place during the morning rush hour. The impact of the McWaters vehicle pushed the Lozoya vehicle into the vehicle in front of it, driven by Christine Sotelo, who testified at trial.

{7} Ms. Sotelo testified that prior to the accident, the truck driven by Osbaldo had been following her very closely. She tried to communicate that to him. He backed off a little bit, but then she was rear-ended by Osbaldo's vehicle that had been rear-ended by the McWaters vehicle during the stop-and-go traffic of the rush hour. After the accident, all three vehicles stopped, and Osbaldo and Ubaldo got out of their truck, and waited for the police to arrive. Ms. Sotelo's vehicle was not damaged by the collision. Osbaldo did not seek medical care as a result of this accident. Although Ubaldo testified that he was already 100 percent disabled prior to this collision, his doctor testified that

his present condition is 10 to 15 percent attributable to this accident.

{8} Evidence was also presented that Ubaldo had back problems prior to the accidents. He had actually reported to University Hospital complaining of lower back pain eleven days prior to the first accident. Ubaldo had a compression fracture in his back, which one doctor testified "probably pre-dated the first accident." Ubaldo's work in the construction trades, including two incidents of falling off a ladder could have caused this fracture. The doctor also testified that Ubaldo had a herniated disk in his spine that could have existed prior to the first accident.

{9} At the time of the first accident, Ubaldo lived in a domestic partnership with Sara Lozoya, although they were not married. They had, however, "been together" for over 30 years. They had three children together. Osbaldo was the youngest. For fifteen years they had lived together in a home that they had purchased. They carried the same last name, and had filed joint tax returns since at least 1997. They were formally married after the first accident, but before the second one, in November 1999.

{10} Ubaldo testified that prior to the accidents, he and Sara had a happy relationship, which included going out dancing, and visiting friends together. Sara testified that they had an intimate relationship, and that they made decisions together. After the first accident, the relationship changed dramatically because Ubaldo became depressed. They could not socialize nearly as much because of the pain that Ubaldo experienced. Ubaldo would stay in bed quite a bit. Their sexual relationship also diminished. After the second accident, the relationship worsened further.

## II

{11} The Lozoyas' claims in both accidents were brought in a single lawsuit, and the case went to a jury trial in June 2001. During the course of the trial, the court did not allow Plaintiffs to present evidence that Ubaldo had one vehicle repossessed for failure to make the payments, and that foreclosure proceedings on the house had recently

been initiated against him, although they were allowed to inform the jury that he had not been able to make the payments. After all the evidence was presented, Plaintiffs submitted a special verdict form that would have itemized the types of damages awarded, but the court chose to use the form found in our Uniform Jury Instructions. Plaintiffs also sought to have the jury consider a loss of consortium claim in favor of Sara Lozoya, but the court granted a directed verdict as to that claim in relation to the first accident, because they were not legally married at the time.

{12} Mr. Sanchez and Statkus Engines admitted negligence as to the first accident. The jury returned a verdict in favor of Plaintiffs as to that accident, assessing damages in favor of Ubaldo in the amount of $38,500, and in favor of Osbaldo in the amount of $1500. Although the court allowed the jury to consider Sara's loss of household services by Ubaldo, the jury did not award any damages as to that claim. Mr. McWaters did not admit negligence as to the second accident, and the jury found that he was not negligent. Accordingly, no Plaintiff was awarded any damages as a result of the second accident. After the trial's conclusion, Plaintiffs moved for a new trial, based on the same asserted errors they bring before this Court, as well as some others. This motion was denied and the district court entered judgment according to the jury verdict.

## III

{13} Plaintiffs make numerous claims on appeal. Their first claim is that the trial court should have allowed the jury to consider Sara's loss of consortium claim as to the first accident. They also claim that substantial evidence does not support the finding of no negligence on Mr. McWaters' part. They claim that the court should have allowed the jury to consider the fact that Ubaldo had one vehicle repossessed, and foreclosure proceedings on his house had been initiated. They also claim the court should have allowed the jury to learn the amount of social security payments that Ubaldo received. They also claim that the jury verdict should be overturned because it was the result of passion or

prejudice. Finally, Plaintiffs claim that the district court erred by not submitting their proposed special verdict form. We address each argument in turn, and hold that the district court should be affirmed as to all issues, except the directed verdict as to Sara's loss of consortium claim, and the verdict of no negligence on the part of Mr. McWaters.

## A

{14} Sara brought a loss of consortium claim against both Mr. Sanchez and Mr. McWaters. The district court did not allow the jury to consider such a claim as against Mr. Sanchez, however, because she was not married to Ubaldo at the time. The district court did allow the jury to consider Sara's loss of consortium claim against Mr. McWaters, because Sara and Ubaldo had been married during the interim between the two collisions. The jury did not award Sara damages for this claim because it found that Mr. McWaters was not negligent. Sara claims that the district court erred by not allowing the jury to consider her loss of consortium claim against Mr. Sanchez and his employer.

{15} New Mexico courts did not recognize actions for loss of consortium, spousal or otherwise, until 1994, when this Court decided *Romero v. Byers*, 117 N.M. 422, 872 P.2d 840 (1994). This Court recognized a claim for spousal consortium in *Romero* because the several justifications previously used to disallow the claim were no longer valid. Further, under our working definition of whether a person should owe a duty to a potential plaintiff, it was clear that such a duty should be extended toward the spouse of an injured party. We stated the modern duty rule as follows:

> In New Mexico, negligence encompasses the concepts of foreseeability of harm to the person injured and of a duty of care *toward that person* . . . .
>
> Duty and foreseeability have been closely integrated concepts in tort law since the court in [*Palsgraf v. Long Island Railroad Co.*, 248 N.Y. 339, 162 N.E. 99 (1928),] stated the issue of foreseeability in terms of duty. If it is found that a plaintiff, and injury to that plain-

tiff, were foreseeable, then a duty is owed *to that plaintiff* by the defendant.

*Solon* [*v. WEK Drilling Co.*], 113 N.M. [566,] 569, 829 P.2d [645,] 648 [(1992)] (quoting *Ramirez v. Armstrong*, 100 N.M. 538, 541, 673 P.2d 822, 825 (1983)) (emphasis added by *Solon* ).

> In determining duty, it must be determined that the injured party was a foreseeable plaintiff—that he was within the zone of danger created by [the tortfeasor's] actions; in other words, to whom was the duty owed?
>
> . . . A duty to an individual is closely intertwined with the foreseeability of injury to *that individual* resulting from an activity conducted with less than reasonable care by the alleged tort-feasor.

*Id.* (quoting *Calkins v. Cox Estates*, 110 N.M. 59, 61–62, 792 P.2d 36, 38–39 (1990)) (emphasis in original).

*Romero*, 117 N.M. at 425–26, 872 P.2d at 843–44. Our duty rule also asks whether any public policy factors preclude the court from imposing a duty of care toward a foreseeable plaintiff. *See Torres v. State*, 119 N.M. 609, 611–12, 894 P.2d 386, 388–89 (1995). Applying this rule in *Romero*, we held that it is foreseeable that a surviving spouse would experience emotional distress as a result of injury to or death of a victim of negligent conduct. The law should impose a duty upon the tortfeasor toward that surviving spouse. 117 N.M. at 426, 872 P.2d at 844. Conspicuously, the duty standard used says nothing about the legal relationship between the victim and the claimant.

{16} While this Court was the last in the nation to recognize that a spouse may bring a cause of action for loss of consortium, *see id.* at 425 n. 1, 872 P.2d at 843 n. 1, we were the first in the nation to recognize that a grandparent may bring such a claim in certain circumstances as well. *See Fernandez v. Walgreen Hastings Co.*, 1998–NMSC–039, ¶ 24, 126 N.M. 263, 968 P.2d 774. In that case, we applied the same definition of duty for loss of consortium purposes, and held that "it can be foreseeable that negligently causing the death of a twenty-two month old child will cause emotional distress to a grand-

parent who had a close familial relationship with the child." *Id.* ¶ 31.

{17} Since we decided *Fernandez*, however, this Court has not had the opportunity to consider whether loss of consortium benefits should be extended in any situation other than claims of spouses and parental or grandparental caretakers of minor children. Plaintiffs now ask us to decide whether the same rationales that led us to extend a cause of action for loss of consortium in those situations should apply here. At the outset, we note that no other State in the union currently allows unmarried cohabitants to recover for loss of consortium. We are not without guidance, however, because many courts have wrestled with this issue and considered the various implications for extending the cause of action in this situation. The only state court decision we have found that allowed this type of claim, *Butcher v. Superior Court*, 139 Cal.App.3d 58, 188 Cal.Rptr. 503 (Ct.App.1983), *overruled by Elden v. Sheldon*, 46 Cal.3d 267, 250 Cal.Rptr. 254, 758 P.2d 582 (1988),[1] has served as a springboard for academic discussion of this issue, *see, e.g.,* Barbara J. Cox, *Alternative Families: Obtaining Traditional Family Benefits Through Litigation, Legislation and Collective Bargaining,* 15 Wis. Women's L.J. 93, 133–37 (2000), as well as thorough and thoughtful analysis by the judiciary across the country, *see, e.g., Trombley v. Starr–Wood Cardiac Group, PC,* 3 P.3d 916, 922–23 (Alaska 2000). More convinced by the policies and rationales that favor recognizing the claim by unmarried cohabitants in certain circumstances, we conclude that the jury should have been allowed to consider Ms. Lozoya's claim.

{18} As the court in *Trombley* suggested, "[w]hether spousal consortium claims should be extended to unmarried cohabitants as a general matter is not an easy issue to resolve. There are reasonable arguments on both sides." *Id.* at 923. Here, Defendants delineate many of the bases for precluding

the claim. They argue that: (1) a legal relationship has always been a limiting factor, even for grandparents, in determining who should be able to recover; (2) the legal status of the parties serves to provide courts with clear guidance as to who should recover; (3) it would be inequitable to allow a cohabitant to reap the benefits of a legal marriage without being required to assume the burdens of marriage; (4) to extend the cause of action in this case would be the equivalent of recognizing common law marriage; and (5) extending the cause of action would lead to an unworkable standard with many unanswered questions. We consider each in turn.

{19} Defendants argue that the cause of action for loss of consortium should only be extended to those with a "special legal status." Spouses who are legally married clearly fit this definition. Defendants further assert, however, that this was a dispositive underpinning of our holding in *Fernandez*, where we extended the cause of action to a grandparent who was a caretaker of her minor grandchild. Defendant is correct that we observed in that case that our legislature has authorized courts to extend visitation rights to grandparents of minor children. *See Fernandez,* 1998–NMSC–039, ¶ 31, 126 N.M. 263, 968 P.2d 774 (quoting NMSA 1978, § 40–9–2(A) (1993)). Defendant misconstrues our reliance on this legal status. There, we were only pointing out that our legislature has recognized the importance of the grandparent-grandchild relationship. We did not hold that this is a requirement before one can bring a claim for loss of consortium. The special legal status is evidence of a close familial relationship, not an independent basis for recovery. *See id.*

{20} Defendants are correct in their assertion that limiting the field of potential claimants to those with a legal relationship to the victim would serve as a convenient and easily applied line-drawing mechanism for courts. This is perhaps the most significant

---

1. In their Brief in Chief, Plaintiffs argue that this Court should adopt the reasoning of *Butcher.* Plaintiffs fail to mention, however, that this case has been expressly overruled by the California Supreme Court. We caution counsel that the knowing failure to mention that authority would violate Rule 16–303(A)(3) NMRA 2003 (stating that a lawyer shall not knowingly "fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel").

reason that many courts allow only spouses to make a loss of consortium claim. In their Answer Brief, Defendants point out, "[o]ne would also envision that the injured person has cousins, co-workers, drinking buddies and softball team members who may lose his society, companionship and guidance. For that matter, the dead or injured person may have been having an affair with his married neighbor, who also may suffer a loss of consortium." By only allowing those who are legally married, or familial caretakers to recover, courts would have an easy way for us to dispose of many claims. Ease of administration, however, does not necessarily further the interests of justice. We must consider the purpose behind the cause of action for loss of consortium. A person brings this claim to recover for damage to a *relational* interest, not a legal interest. To use the legal status as a proxy for a significant enough relational interest is not the most precise way to determine to whom a duty is owed. Furthermore, the use of legal status necessarily excludes many persons whose loss of a significant relational interest may be just as devastating as the loss of a legal spouse. Of course, the State has a continuing interest in protecting the legal interest of marriage as well. Allowing an unmarried partner to recover for loss of consortium neither advances nor retracts from that interest. It is doubtful that anyone would choose to marry simply because they would not be allowed to bring a future loss of consortium claim otherwise.[2]

{21} In *Dunphy v. Gregor*, 136 N.J. 99, 642 A.2d 372 (1994), the Supreme Court of New Jersey considered whether a woman who was engaged to and cohabited with the victim of an automobile accident could recover against the defendant for negligent infliction of emotional distress ("NIED"). NIED is a claim that is often considered by courts at the same time as a claim for loss of consortium, and the same policies are implicated by broadening the field of potential claimants for each. *See generally Elden*, 46 Cal.3d 267, 250 Cal.Rptr. 254, 758 P.2d 582 (rejecting a claim for NIED, then concluding that the same factors warrant rejecting a claim for loss of consortium). The *Dunphy* court observed that a "marital or intimate, familial relationship between the plaintiff and the injured person" was a required basis for recovery on an NIED claim. *Dunphy*, 642 A.2d at 374. When confronted with the same argument made here that a legal relationship provides an easy line-drawing mechanism, the court responded:

> [W]e are convinced that the solution to the posed question lies not in a hastily-drawn 'bright line' distinction between married and unmarried persons but in the 'sedulous application' of the principles of tort law, which inform our ultimate determination that a particular claimant is owed a duty of care.

*Id.* at 376 (quoted authority omitted). The court continued:

> Our courts have shown that the sound assessment of the quality of interpersonal relationships is not beyond a jury's ken and that courts are capable of dealing with the realities, not simply the legalities, of relationships to assure that resulting emotional injury is genuine and deserving of compensation.

*Id.* at 378. We agree. Although imposition of a duty is a legal question for the court, oftentimes it is dependent on a factual determination, which we entrust to the jury. *Sarracino v. Martinez*, 117 N.M. 193, 194–95, 870 P.2d 155, 156–57 (Ct.App.1994). It is appropriate that the finder of fact be allowed to determine, with proper guidance from the court, whether a plaintiff had a sufficient

---

**2.** We note that, by not making legal status a dispositive factor in determining whether loss of consortium benefits should be extended, we avoid the problems other courts experience when one person is injured and then is married shortly thereafter. Those courts typically hold that a person should not be allowed to marry someone for the purpose of acquiring a cause of action. *See generally* Charles Plovanich, Annotation, *Recovery for Loss of Consortium for Injury Occurring Prior to Marriage*, 5 A.L.R.4th 300 (1981). This issue becomes more difficult when the injury occurred but was not discovered until after the marriage, *see, e.g., Owens–Illinois, Inc. v. Gianotti*, 148 Md.App. 457, 813 A.2d 280, 294–301 (2002), or when the parties were engaged at the time of the injury, and were married a short time thereafter, *see Sutherland v. Auch Inter-Borough Transit Co.*, 366 F.Supp. 127, 133–34 (E.D.Pa.1973).

enough relational interest with the victim of a tort to recover for loss of consortium.

{22} Next, Defendants argue that to extend a cause of action for loss of consortium in the present case would be to extend the benefits of marriage to Sara, without requiring her to undertake the burdens of marriage, implying that somehow Sara would be unfairly taking advantage of her position. Specifically, Defendants point out that Sara did not commit to giving her income and property to the community, under NMSA 1978, § 40–3–8(B) (1999); she did not commit to paying Ubaldo's debt, under NMSA 1978, § 40–3–11 (1995); she did not commit to leaving a share of her estate to Ubaldo when she dies, under NMSA 1978, § 45–2–301 (1995); she did not have to pay income taxes jointly; and she could have left the relationship any time she wanted without going through the process of a divorce.

{23} Defendants are correct in all of these assertions. What Defendants do not recognize is that almost all of these burdens have a corresponding benefit that Sara also did not receive when she was not married to Ubaldo. Because she was not married to Ubaldo, she had no legal claim to require *him* to give to the community his property acquired during the marriage, or to require him to pay her debts, or to require him to leave her a portion of his estate. Further, she did not have the benefit of the security that a marriage brings, because Ubaldo could have left without a divorce just as easily as she could. She may only obtain these benefits of marriage by getting married. Availability of a cause of action for loss of consortium is not a benefit of marriage, any more than it could be a benefit of being a familial caretaker. It is a method of compensation for one who has suffered the loss of a significant relational interest. By extending a cause of action for loss of consortium, this Court is not giving Sara the benefits of marriage without the burdens.[3] We reject any

implication that we are enabling Sara to take unfair advantage of the legal system by providing that she may be able to recover for loss of consortium, without paying the "price" of marriage.

{24} In a related argument, Defendants claim that we would be, in effect, recognizing common law marriage by allowing the claim to proceed. Defendants are correct that this State has not recognized common law marriage[4] after we decided *In re Gabaldon's Estate*, 38 N.M. 392, 34 P.2d 672 (1934). "For a marriage to be valid, it must be formally entered into by contract and solemnized before an appropriate official." *Merrill v. Davis*, 100 N.M. 552, 553, 673 P.2d 1285, 1286 (1983). By allowing a claim for loss of consortium, we are not extending any of the benefits and responsibilities of marriage discussed above to the claimant. Our holding today in no way alters this State's nonrecognition of common law marriage. We do think, however, that if a couple were to satisfy the elements of a common law marriage, as it exists in other states, this would be a great indication that the couple would have a significant enough relationship to warrant a claim for loss of consortium.

{25} Although the precise requirements vary from state to state, the general rule in states recognizing common law marriage is that two basic elements must be satisfied. First, the couple must have an actual and mutual agreement to marry. Second, the parties must mutually assume marital rights, duties and obligations. *E.g., Metro Life Ins. Co. v. Johnson*, 103 Idaho 122, 645 P.2d 356, 361 (1982); 55 C.J.S. *Marriage* § 10, at 563 (1998). The apparent majority rule in states that recognize common law marriage is that this agreement need not be express, but may be inferred from the parties' conduct. *See, e.g., Johnson*, 645 P.2d at 361. *But see Staudenmayer v. Staudenmayer*, 552 Pa. 253, 714 A.2d 1016, 1021 (1998) (requiring proof of

---

3. The only "burden" of marriage listed by Defendants which does not have a corresponding benefit to Sara is payment of taxes as a married couple. Not only is this burden *de minimis*, but the evidence presented demonstrates that Sara and Ubaldo did file their taxes as a married couple, since at least 1997.

4. This State does recognize common law marriage, if it is validly entered into in another State. *See* NMSA 1978, § 40–1–4 (1862–1863).

"the exchange of words in the present tense for the purpose of establishing the relationship of husband and wife" when both parties are available to testify). Thus, "circumstantial evidence such as cohabitation, reputation and the manner in which the couple characterize their relationship" are all types of circumstantial evidence that may be used to prove consent. *Johnson,* 645 P.2d at 361. Some states require a strict burden of proof, such as clear and convincing evidence, while others apply a preponderance of the evidence standard. *Id.* at 360 (collecting cases from various states applying different burdens of proof). While not recognizing common law marriage in this state, we do recognize that this type of evidence would be highly probative in determining the closeness of the relationship between the victim and the claimant in a loss of consortium case. *See* Cynthia Grant Bowman, *A Feminist Proposal to Bring Back Common Law Marriage,* 75 Or. L.Rev. 709, 764–65 (1996) (arguing that states which have abolished common law marriage should return to recognizing it, so that loss of consortium claims would not be inhibited).

{26} Finally, Defendants argue that allowing unmarried couples to recover for loss of consortium would create an impractical and unworkable cause of action. This would only be true if this Court does not do its duty of providing sufficient guidance to lower courts when determining whether a claim should be allowed. We think that the criteria set forth in *Dunphy* help greatly in this regard. Claimants must prove an "intimate familial relationship" with the victim in order to recover for loss of consortium. *Dunphy,* 642 A.2d at 377. "Persons engaged to be married and living together may foreseeably fall into that category of relationship. '[G]iven the widespread reality and acceptance of unmarried cohabitation, a reasonable person would not find the plaintiff's emotional trauma to be "remote and unexpected." ' " *Id.* (quoting *Elden,* 250 Cal.Rptr. 254, 758 P.2d at 591 (Broussard, J., dissenting)).

{27} Of course, not everyone who is engaged to be married, living together, or assuming the roles of husband and wife (common law or not) will be entitled to recover.

The claimant must prove a close familial relationship with the victim. *Fernandez,* 1998–NMSC–039, ¶ 31, 126 N.M. 263, 968 P.2d 774. Courts should presume that such a relationship exists if the couple fits into one of the above categories, but a myriad of factors should be considered to determine whether the relationship was significant enough to recover.

> That standard must take into account the duration of the relationship, the degree of mutual dependence, the extent of common contributions to a life together, the extent and quality of shared experience, and ... whether the plaintiff and the injured person were members of the same household, their emotional reliance on each other, the particulars of their day to day relationship, and the manner in which they related to each other in attending to life's mundane requirements.

*Dunphy,* 642 A.2d at 378 (internal quotation marks and citation omitted). By adopting this standard for determining whether an intimate familial relationship exists for loss of consortium purposes, we are putting no additional burden on the finder of fact. Even if the claimant and the victim are actually married, all of this information would need to be weighed when determining the amount of damages anyway. *See Romero,* 117 N.M. at 424–27, 872 P.2d at 842–45 (defining the elements of a claim for loss of consortium).

{28} We realize that problems may arise in the future if one wishes to establish a presumption of an intimate familial relationship by proving the elements of a common law marriage, since common law marriage is not recognized in this state. For loss of consortium purposes, we believe a presumption should arise in favor of a close familial relationship when the claimant can prove the elements stated in *Johnson,* of mutual consent to be married followed by a mutual assumption of marital rights, duties or obligations. 645 P.2d at 361. Consent may be implied from the parties' acts or conduct, and the usual civil burden of proof of preponderance of the evidence should apply. *Id.* at 360–61. We think this standard is most appropriate for our purpose of establishing a significant relational interest, rather than es-

tablishing that the parties were actually married. It is also consistent with *Fernandez* and *Romero,* where we did not alter the burden of proof for this cause of action. *See generally Fernandez,* 1998–NMSC–039, ¶ 32, 126 N.M. 263, 968 P.2d 774; *Romero,* 117 N.M. at 426–27, 872 P.2d 840.

{29} Due to Defendants' concerns that we should not create an unworkable standard, we think that further limits are appropriate. First, a person can only have an intimate familial relationship with one other person at any one time. That is to say, if a person is married to a different person than the victim of the tort, the claim will be barred. In the case of claims by unmarried cohabitants, the relationship between the claimant and the victim must be demonstrated to be committed and exclusive. *See Trombley,* 3 P.3d at 923.[5] Second, the burden of proving that an intimate familial relationship existed will be on the claimant, with a presumption that this exists if the parties were engaged, married, or met the general test for common law marriage. The defendant should not have the burden of "fighting off" multiple claims for loss of consortium.

{30} In the present case, we cannot deny that Ubaldo and Sara enjoyed a relationship that was very similar, if not identical, to that of the typical married couple, or that a reasonable jury could so find. They had lived together in a house that they owned together for at least fifteen years. They had three children whom they raised together. They carried the same last name, and they generally enjoyed spending time with one another and participating in social events as a couple. Further, their intent to be committed to one another indefinitely is evidenced by their

marriage shortly after the first accident, despite Ubaldo's debilitating injuries.[6]

{31} On the record before us, it seems clear that a reasonable jury could find that Ubaldo and Sara would have met the test for common law marriage under the standard followed in *Johnson.* They held themselves out as a married couple. Further, they testified as to their mutual dependence on each other in their day to day lives. Every single factor we have enunciated for determining whether they had an intimate familial relationship also appears to cut in their favor. We believe that the evidence presented demonstrates that Sara may be able to present a cognizable claim for loss of consortium. She should therefore be allowed to present this claim to the jury.[7]

**B**

{32} The district court submitted a special verdict form to the jury regarding the second accident, which required the jury to decide whether Mr. McWaters was negligent, and if so, instructed the jury to apportion the amount of fault between Osbaldo and Mr. McWaters. Plaintiffs claim that this was error, presumably because the evidence did not support a finding of any negligence on Osbaldo's part. Mr. McWaters points out, however, that the only portion of the special verdict form which the jury completed was virtually identical to the proposed form submitted by Plaintiffs. This portion of the special verdict form simply asked whether Mr. McWaters was negligent, and it was based on our Uniform Jury Instructions. *See* UJI 13–2220 NMRA 2003. We see no error in the use of this form. The purpose of the trial was to determine whether Mr. McWaters was negligent. This form asked

---

5. Of course, this rule would not apply to familial caretakers. One can be a familial caretaker, under *Fernandez,* sufficient to recover if the minor child is injured, and still have a close familial relationship with his or her spouse/partner sufficient to recover if that person is injured as well.

6. We recognize that there was little evidence of any household services performed by Ubaldo, but this is a separate and independent claim from loss of consortium. *See* UJI 13–1810 NMRA 2003.

7. We note that the district judge appeared convinced that the evidence would have supported a loss of consortium claim, but for the lack of a valid marriage. After granting the motion for a directed verdict as to this claim, the judge made the following comments: "[I]t's the kind of case, really where everything is on your side, Mr. Garcia, but the case law isn't. And [the Court of Appeals would] have to make a big step to do that. This may be the case they're looking for...."

that very question. Regarding the second part of the form, which would have apportioned fault between Osbaldo and Mr. McWaters, if the jury had needed to reach it, this was of course entirely appropriate. We have "adopted a form of pure comparative negligence in which the jury apportions fault, regardless of degrees of fault, between the plaintiff and the defendant." *Torres v. El Paso Elec. Co.*, 1999–NMSC–029, ¶ 13, 127 N.M. 729, 987 P.2d 386 (citing *Scott v. Rizzo*, 96 N.M. 682, 689–90, 634 P.2d 1234, 1241–42 (1981)).

{33} Plaintiffs raise a second, related issue regarding Mr. McWaters' negligence. They claim that there is no substantial evidence to support the jury's verdict that Mr. McWaters was not negligent. NMSA 1978, § 66–7–318(A) (1971), states that "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway." Violation of this statute constitutes negligence as a matter of law. *See Rogers v. Thomas*, 81 N.M. 723, 724, 472 P.2d 986, 987 (Ct.App. 1970); *see also Fitzgerald v. Valdez*, 77 N.M. 769, 773, 427 P.2d 655, 657 (1967) ("Statutory violations are negligence per se if the statute violated was enacted for the benefit of the person injured."). The district court recognized this, and instructed the jury properly in this regard.

{34} In reviewing a sufficiency of the evidence claim, we view the evidence "in a light most favorable to the prevailing party and disregard any inferences and evidence to the contrary." *Montoya v. Torres*, 113 N.M. 105, 109, 823 P.2d 905, 909 (1991). Mr. McWaters testified that he was driving his 32,000 pound dump truck along Interstate 40 near the interchange during morning rush hour traffic when the collision happened. He further testified that he was familiar with rush hour traffic in the area, because he drives on the highway every day, and that traffic was bumper to bumper. He testified that the sun was in his eyes, and he answered in the affirmative when asked if he failed to keep a proper lookout for the vehicles in front of him. Despite all this, Mr.

McWaters argues that the testimony of Ms. Sotelo, the driver of the car that was in front of the Lozoyas, provided enough evidence to conclude that Mr. McWaters was not negligent. Ms. Sotelo testified that the Lozoya vehicle was following her too closely, and that Osbaldo nearly hit her a couple of times before the accident.

{35} Clearly, Ms. Sotelo's testimony was relevant in determining the degree of Osbaldo's negligence, if any. This testimony had no bearing, however, on Mr. McWaters' conduct. Mr. McWaters all but admitted that he acted negligently when he collided with the Lozoya vehicle. The fact that he rear-ended the Lozoya vehicle, while being fully aware of the busy traffic conditions, with the sun in his eyes, is strong evidence that he "follow[ed] another vehicle more closely than is reasonable and prudent," in violation of Section 66–7–318(A). This constituted negligence per se, and there was no evidence to support the jury's verdict that it was not. This does not mean that Mr. McWaters was fully responsible for the accident or any injuries sustained by the Lozoyas as a result of the accident. Osbaldo's actions such as slamming on the brakes to avoid hitting Ms. Sotelo's car in front of him could certainly have contributed to it. The finding that Mr. McWaters was not negligent at all, however, was erroneous because it was not supported by substantial evidence. We therefore reverse the jury verdict as to Mr. McWaters.

## C

{36} Next, Plaintiffs argue that the district court erred by excluding evidence that Ubaldo's vehicle had been repossessed after the accidents, and that foreclosure proceedings had been initiated on his house. Plaintiffs contend that these circumstances were caused by the financial hardship Ubaldo and Sara experienced as a result of the accidents.

{37} We will reverse the district court's decision to admit or exclude evidence only if it is clear that the court abused its discretion. *Buffett v. Vargas*, 1996–NMSC–012, ¶ 8, 121 N.M. 507, 914 P.2d 1004. Here, the district court excluded evidence of the

foreclosure proceedings and repossession both because of their lack of relevancy and their propensity to confuse the issues. *See* Rule 11–402 NMRA 2003; Rule 11–403 NMRA 2003. The district court properly instructed the jury to consider damages for lost earnings and earning capacity. We agree with the district court that this evidence was not relevant under Rule 11–402. The foreclosure proceedings and repossession are independent of Ubaldo's lost earnings claim, and they do not change the amount of economic damages. Further, the district court properly exercised its discretion in excluding the evidence under Rule 11–403, because evidence of the foreclosure proceedings and repossession may have given the jury the wrong impression that Plaintiffs should have been compensated for these events.

**D**

{38} Plaintiffs also argue that the district court improperly excluded evidence of the amount of monthly payments that Ubaldo received from the Social Security Administration. They argue that the jury may have assumed that these payments fully compensated Ubaldo for his injuries, while in reality they were quite low. Plaintiffs never attempted to have this evidence brought before the jury, either through asking a witness, or through an offer of proof. In other words, this evidence was never excluded; it simply was not offered. Plaintiffs discussed the amount of the payments with the court, out of the presence of the jury. If anything, it appears that the court told Plaintiffs that they may go ahead and offer the evidence, but they decided not to do so. When Plaintiffs did put evidence before the jury that the Social Security Administration had determined that Ubaldo was totally disabled, over Defendants' objection, Plaintiffs never attempted to inform the jury of the amount of these payments. "[A] trial court can be expected to decide only the case presented under issues fairly invoked." *State v. Gomez,* 1997–NMSC–006, ¶ 14, 122 N.M. 777, 932 P.2d 1. Thus, we require a party to

invoke a ruling or decision by the district court to preserve a question for review. Rule 12–216(A) NMRA 2003. Because the district court did not rule on this issue, Plaintiffs may not raise it for the first time on appeal.

**E**

{39} Next, Plaintiffs contend the jury verdict should be overturned because it was the result of passion or prejudice. We do not disturb the jury's damage award "except in extreme cases, as where it results from passion, prejudice, partiality, sympathy, undue influence, or some corrupt cause or motive where palpable error is committed by the jury, or where the jury has mistaken the measure of damages." *Sonntag v. Shaw,* 2001–NMSC–015, ¶ 32, 130 N.M. 238, 22 P.3d 1188 (quoted authority omitted). Further, we weigh the evidence of damages in the light most favorable to upholding the judgment, and we require an "unmistakable indication" of passion or prejudice before overturning a damage award. *Baxter v. Gannaway,* 113 N.M. 45, 48, 822 P.2d 1128, 1131 (Ct.App.1991). "[I]t is not the duty of the appellate court to evaluate the value of pain and suffering," even if the jury's award "appears quite miserly." *Id.* at 49, 822 P.2d at 1132.

{40} The verdict form used by the jury did not ask it to articulate the specific amount awarded for each type of damages. As a result, we do not know exactly how the jury arrived at the amounts that it did. We do know that the $38,500 awarded to Ubaldo, and the $1500 awarded to Osbaldo, represent substantially more than the medical expenses incurred as a result of the first accident.[8] Ubaldo claims that he should be entitled to $579,696 in lost earning capacity, and $345,560 in lost enjoyment of life. The evidence regarding loss of earnings and earning capacity was highly disputed at trial, and Defendants contend that Ubaldo's earnings actually increased after the accident. Further, the jury could have concluded that Ubaldo is not precluded from continuing to

---

8. Plaintiffs allege that Ubaldo and Osbaldo were entitled to damages for medical expenses due to

the first accident in the amount of $5,296.91, and $651.02, respectively.

supervise his workers in his lath and plaster business. Finally, the jury may have believed that many of Ubaldo's health problems pre-existed the accident, and therefore were not recoverable. We cannot say that the amount of the jury's award was "so unrelated to the evidence as to shock the conscience of the [C]ourt." *Id.*

## F

{41} Finally, Plaintiffs claim that the district court erred by denying their request to submit a special verdict form to the jury which would have itemized the damages awarded. Instead, the court chose to submit the Uniform Jury Instruction, UJI 13–2220. The district court should use the Uniform Jury Instructions unless "under the facts or circumstances of the particular case the published UJI Civil is erroneous or otherwise improper." Rule 1–051(D) NMRA 2003. We review the district court's decision in this regard for an abuse of discretion. *Gallegos v. N.M. Bd. of Educ.*, 1997–NMCA–040, ¶ 37, 123 N.M. 362, 940 P.2d 468. We review the instructions to determine if they fairly present the issues and applicable law, when considered as a whole. *Kestenbaum v. Pennzoil Co.*, 108 N.M. 20, 26, 766 P.2d 280, 286 (1988). Here, the district court sufficiently instructed the jury as to each type of damages recoverable by Plaintiffs in a separate instruction. This fairly presented the issues and applicable law to the jury.

## IV

{42} We hold that the district court should have permitted the claim for loss of consortium regarding the accident that took place prior to the time Ubaldo and Sara were married to go to the jury. We hold that substantial evidence supports the amount of the verdict in favor of Ubaldo and Osbaldo as a result of the first accident. We reverse as to the jury's conclusion that Mr. McWaters was not negligent in the second accident, for lack of substantial evidence. Finally, we hold that the district court did not abuse its discretion by excluding certain evidence at trial. We therefore affirm with regard to all claims except the loss of consortium claim, and the verdict of no negligence on the part of Mr. McWaters, and remand for a new trial limited to those issues.

{43} **IT IS SO ORDERED.**

WE CONCUR: PETRA JIMENEZ MAES, Chief Justice, PATRICIO M. SERNA, RICHARD C. BOSSON, and EDWARD L. CHAVEZ, Justices.