GAYLEN L. CATRON, APPELLANT, V.
MARVIN R. LEWIS ET AL., APPELLEES.
712 N.W.2d 245

Filed April 14, 2006.    No. S-04-1212.

Maren Lynn Chaloupka and Robert Paul Chaloupka, of Chaloupka, Holyoke, Hofmeister, Snyder & Chaloupka, for appellant.

James L. Zimmerman, of Zimmerman Law Firm, P.C., L.L.O., for appellees Marvin R. Lewis and Skylar L. Panek.

Jon Bruning, Attorney General, Vicki L. Adams, and Frederick J. Coffman for appellee State of Nebraska.

HENDRY, C.J., CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ., and HANNON, Judge, Retired.

McCORMACK, J.

## NATURE OF CASE

This action was brought by Gaylen L. Catron against Marvin R. Lewis, Skylar L. Panek, and the State of Nebraska (collectively the defendants). Catron was operating a motorboat on Center Lake at the Bridgeport State Recreation Area in Morrill County, Nebraska, pulling two tubes ridden by two of his daughter's friends, Samantha Rader and Aimee Stuart. Panek accidentally struck and killed Rader with a jet ski he was operating. The jet ski was owned by Lewis, and the recreation area is operated by the State.

Catron's action sought damages for emotional distress stemming from his witnessing the accident and his unsuccessful attempt to rescue Rader. Catron alleged that such distress was a proximate result of the negligent acts or omission of the defendants, specifically, the negligent operation of the jet ski by the then 14-year-old Panek, the negligent entrustment of the jet ski to Panek by Lewis, and the failure of the State to operate the Bridgeport State Recreation Area in a manner reasonably safe for foreseeable users under foreseeable conditions.

The district court granted summary judgment in favor of the defendants, and Catron appeals.

## BACKGROUND

The accident in question occurred on July 5, 2002. On that day, Catron took his boat out on Center Lake to take Rader and Stuart riding on towable tubes. Rader and Stuart were friends of Catron's daughter and were not related to him. The towropes which attached the tubes that Rader and Stuart were riding to Catron's boat were approximately 61 feet long. The tubes generally stayed within 1½ feet of each other on the water. Rader and Stuart rode the tubes sitting facing away from the boat.

The lake is circular with a center island and two narrower and shallower channels connecting the two sides of the "circle." Boat traffic travels in a counterclockwise direction. After going around the lake twice, pulling the tubes in which Rader and Stuart rode, Catron decided to go onto shore, where Rader and Stuart had

camped the night before with Catron's daughter and some other girls. After having gone through one of the narrow channels, and heading counterclockwise, Catron testified that he made his customary loop maneuver to go in straight toward the shore. This involved slowing down so that the tubes did not swing to the side of the boat and making a small circle in which he briefly traveled clockwise before traveling perpendicular to the traffic flow in order to nose straight onto the beach. As he was traveling straight east toward the shore, Catron stated that he noticed two jet skis heading north (counterclockwise) toward the right side of Catron's boat. One of the jet skis was being ridden by Panek.

Catron estimated that when he first saw them, the jet skis were 75 yards away going approximately 35 to 40 miles per hour. Catron then looked back behind his boat to confirm that the tubes were traveling straight behind his boat. Stuart confirmed in her deposition testimony that right before the accident, the ropes pulling the tubes were taut and that the tubes were traveling directly behind the boat, inside the wake.

In his deposition, Catron indicated that he feared for his safety "[j]ust when [the jet skis were] aiming at my boat." He subsequently explained during a psychiatric examination that he was not really afraid that the jet skis were going to hit his boat; he just did not know for sure what they were going to do. He was able to make eye contact with Panek and the other boy riding the jet skis before they turned, and he assumed they would either shut down or turn to avoid hitting his boat. Catron did not make any evasive maneuvers. When the jet skis turned, Catron became afraid they were going to hit the tubes Rader and Stuart were on.

Panek did in fact run into Rader, killing her. Catron testified that he saw Panek's jet ski hit the tube Rader was on and then saw Rader lying face down in the water "in a pool of blood." Catron jumped in, swam over to her, and floated her back to the boat. Rader was nonresponsive. With assistance, Catron was able to get Rader to shore.

Panek also testified by deposition as to the events immediately preceding the accident. He stated that after coming out (counterclockwise) from the narrow channel, he saw Catron's boat coming in his general direction and then turning in front of him. In order to avoid the boat, Panek stated that he turned to his left

toward the rear of Catron's boat. Panek testified that he did not see the tubes trailing behind the boat until he was upon them.

Panek's description of the accident differs from Catron's in that Panek testified that he first saw Catron's boat as it was heading east and Panek was heading north to northwest. He then stated that the boat turned north to northeast toward shore, as Panek was turning west, effectively swinging the tubes in front of him.

Both Panek's and Catron's versions of the event, however, place the accident at least 61 feet from the rear of Catron's boat.

After the accident, Catron sought help coping with the mental injuries he suffered from witnessing Rader's death. Prior to the accident, Catron had no history of depression, anxiety, emotional problems, or psychiatric treatment. A psychiatrist treating Catron shortly after the accident diagnosed him with major depression, anxiety disorder, and adjustment disorder. The severity of Catron's symptoms was such that it warranted the psychiatrist's certification to Catron's employer that Catron was temporarily disabled from performing his regular occupation as a result of his "major depressive disorder and anxiety/adjustment disorder." Catron accordingly was unable to work for approximately 3 months following the accident. Catron was eventually diagnosed with posttraumatic stress disorder and continues to take antidepressants.

Following the filing of Catron's action against the State, the State raised the affirmative defense that it was immune from suit pursuant to Neb. Rev. Stat. § 81-8,219(1), (7), and (8) (Reissue 2003), and made a motion for summary judgment. Panek and Lewis also moved for summary judgment, arguing that no claim could be had against them for emotional distress because Catron did not fear for himself but was in fear for the people on the tubes. They also argued that Catron did not qualify as a "bystander" because he was not related to the victim. Panek and Lewis also argued that the evidence failed to show distress sufficiently severe to be recoverable. The State argued at the summary judgment hearing that in addition to its claims of lack of negligence and sovereign immunity, Catron was precluded from recovery because, given the distance of over 60 feet, he was not within the zone of danger. As Catron's counsel acknowledged at

the hearing, "elements of proof are that we have to prove negligence by the defendant, we have to prove that the plaintiff was in the zone of danger."

The summary judgment order filed October 1, 2004, granted summary judgment as to Catron's action against the defendants. The district court reasoned that Catron's allegations against the State fell under the discretionary function exception to the State Tort Claims Act and were therefore barred by sovereign immunity. In addition, without specifically rejecting the parties' argument that Catron was neither a bystander nor within the zone of danger, the court reasoned that summary judgment was proper as to all the defendants because Catron's emotional distress did not rise to the standard of being " 'so severe that no reasonable person could have been expected to endure it.' "

## ASSIGNMENT OF ERROR

Catron assigns that the district court erred in sustaining the defendants' motions for summary judgment.

## STANDARD OF REVIEW

■ In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Blinn v. Beatrice Community Hosp. & Health Ctr.*, 270 Neb. 809, 708 N.W.2d 235 (2006).

## ANALYSIS

■ In Nebraska, where there is no impact or physical injury to the plaintiff, the plaintiff seeking to bring an action for negligent infliction of emotional distress must show either (1) that he or she is a reasonably foreseeable "bystander" victim based upon an intimate familial relationship with a seriously injured victim of the defendant's negligence or (2) that the plaintiff was a "direct victim" of the defendant's negligence because the plaintiff was within the zone of danger of the negligence in question. See, *Hamilton v. Nestor*, 265 Neb. 757, 659 N.W.2d 321 (2003); *James v. Lieb*, 221 Neb. 47, 375 N.W.2d 109 (1985). In addition, such plaintiffs whose only injury is an emotional one must show that their emotional distress is medically diagnosable and significant

and is so severe that no reasonable person could have expected to endure it. See *Hamilton v. Nestor, supra.*

The evidence is undisputed that Catron suffered no physical impact or injury from the accident which he attributes to the negligence of the defendants. Furthermore, Catron makes no argument that he had an intimate familial relationship with the fatally injured victim of the accident, Rader. The defendants argue that regardless of whether Catron's alleged emotional distress is of sufficient severity to be legally compensable, he cannot recover for such emotional distress because he was not within the zone of danger of the accident. We agree that viewing the evidence in a light most favorable to Catron, he was clearly not within the zone of danger, and we affirm the district court's grant of summary judgment in favor of the defendants on that basis. See *Logan Ranch v. Farm Credit Bank*, 238 Neb. 814, 472 N.W.2d 704 (1991) (this court may affirm grant of summary judgment on any ground available to trial court, even if it is not same reasoning relied upon below).

In *James v. Lieb, supra*, in differentiating "bystanders" from "direct victims," we described the fact that bystanders are not "immediately threatened with physical injury." 221 Neb. at 49, 375 N.W.2d at 111. See, also, *Nielson v. AT & T Corp.*, 597 N.W.2d 434 (S.D. 1999) (zone of danger includes all parties who are placed in immediate risk of physical harm by defendant's negligent conduct); *Rickey v. Chicago Transit Authority*, 98 Ill. 2d 546, 457 N.E.2d 1, 75 Ill. Dec. 211 (1983) (to be in zone of danger, party must have been in such proximity to accident in which direct victim was physically injured that there was high risk to him of physical impact).

The zone of danger has been described as a complement to the basic requirement that persons exercise reasonable care to protect others from injury. "Those who breach their basic duty of care to others will be required to compensate those who are injured, even when the injuries are not caused by direct impact, but by the operation of foreseeable emotional distress." *Hansen v. Sea Ray Boats, Inc.*, 830 P.2d 236, 240-41 (Utah 1992). Persons in the zone of danger are clearly foreseeable plaintiffs to the negligent actor insofar as they have been placed at unreasonable risk of immediate bodily harm by the actor's negligence.

The fact that the harm results solely through emotional distress should not protect the actor from liability for such conduct. See, *Lozoya v. Sanchez*, 133 N.M. 579, 66 P.3d 948 (2003); *Williams v. Baker*, 572 A.2d 1062 (D.C. 1990); Restatement (Second) of Torts § 436 (1965).

In *Zea v. Kolb*, 204 A.D.2d 1019, 613 N.Y.S.2d 88 (1994), the court held that an action for negligent infliction of emotional distress should have been dismissed because the plaintiff was never in any danger from the vehicle that struck and killed the victim. The plaintiff saw the vehicle while standing in a driveway and feared for the victim who was riding her bicycle on the opposite shoulder of the road. The plaintiff immediately ran after the vehicle, but remained on the opposite shoulder of the road and never overtook it. When the vehicle struck the victim, the plaintiff was 12 to 15 feet away. The plaintiff admitted she was never in any danger from the defendant's vehicle.

Similarly, in *Iacona v. Schrupp*, 521 N.W.2d 70 (Minn. App. 1994), the court affirmed summary judgment in favor of the defendants on the ground that the plaintiff was not within the zone of danger of a truckdriver's negligent conduct. The plaintiff sought damages for emotional distress resulting from witnessing his friend get run over by the truck that was backing up alongside the road to assist the plaintiff who was lying in the grass disorientated. Since the plaintiff was not actually in the road at the time the truckdriver was backing up, the court found he was not in danger of physical injury. Stating that a defendant has no duty to avoid injury to those not placed in peril by his conduct, the court concluded that to hold the truckdriver liable for the plaintiff's distress would "impose on a negligent tortfeasor liability out of proportion to his culpability." *Id.* at 73. Compare *Hamilton v. Nestor*, 265 Neb. 757, 659 N.W.2d 321 (2003) (as operator of one of vehicles involved in collision, motorist was clearly within zone of danger).

Here, it is clear that Catron was not immediately threatened with physical injury as a result of the alleged negligence which resulted in Rader's death. While Catron described the jet skis at one point as coming directly toward him at a rapid speed, Catron admitted he was not in immediate danger. Rather, at that point, the jet skis were approximately 75 yards away, and Catron

assumed the jet skis would either stop or turn in order to avoid a collision with the boat. This is what apparently happened, resulting in the collision with Rader, who was riding in the tube some 61 feet away from the rear of Catron's boat.

While it might be argued that others outside the zone of danger are also foreseeable victims, no jurisdiction allows recovery for all emotional harms, no matter how intangible or trivial, that might be causally linked to the negligence of another. *Consolidated Rail Corporation v. Gottshall*, 512 U.S. 532, 114 S. Ct. 2396, 129 L. Ed. 2d 427 (1994). This is true because "there are no necessary finite limits on the number of persons who might suffer emotional injury as a result of a given negligent act," and thus, to allow recoverability for all such injuries "holds out the very real possibility of nearly infinite and unpredictable liability for defendants." 512 U.S. at 545-46.

This court has extended the class of potential plaintiffs to "bystanders" outside the zone of danger who have a close familial relationship with a seriously injured victim because, as the court in *Migliori v. Airborne Freight Corporation*, 426 Mass. 629, 637, 690 N.E.2d 413, 418 (1998), explained, "[p]ersons bearing close 'familial or other relationship' to the directly injured third person comprise a discrete and well-defined class, membership in which is determined by preexisting relationships." For witnesses having no such close relationship with the victim, however, we limit recoverability to those persons who are within the zone of danger of the negligent conduct which resulted in the incident in question.

## CONCLUSION

Catron was clearly neither a bystander nor a direct victim of the alleged acts which resulted in Rader's death. As a result, Catron cannot recover for the emotional distress allegedly caused by the negligence of the defendants. We, therefore, need not address any alternative grounds for affirmance argued by the parties. Although our reasoning differs from that of the district court, we affirm the district court's grant of summary judgment as to all the defendants.

AFFIRMED.

WRIGHT, J., not participating.